## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

| | | |
|---|---|---|
| **DONNA SUE BERRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 3:14-09859** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Standing Order entered February 26, 2014 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). This case is presently pending before the Court on the parties cross-Motions for Judgment on the Pleadings (Document Nos. 11 and 14.) and Plaintiff's Reply. (Document No. 15.)

The Plaintiff, Donna Sue Berry, (hereinafter referred to as "Claimant"), filed an application for SSI on September 9, 2010 (protective filing date), alleging disability as of June 1, 2009, due to "migraines, carpal tunnel in both wrists, back pain, depression, and artificial voice palate." (Tr. at 11, 98-105, 112, 116.) The claim was denied initially and upon reconsideration. (Tr. at 42-43, 44-46, 52-54.) On May 20, 2011, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 58-59.) A hearing was held on September 11, 2012, before the Honorable Jerry Meade. (Tr. at 27-41.)  By decision dated September 26, 2012, the ALJ determined that Claimant was not

entitled to benefits. (Tr. at 11-21.) The ALJ's decision became the final decision of the Commissioner on December 16, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) Claimant filed the present action seeking judicial review of the administrative decision on February 12, 2014, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2012). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's

2

remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2012). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since September 9, 2010, the application date. (Tr. at 13, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from "dorsal strain; obesity; and depression," which were severe impairments. (Tr. at 13, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 15, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform less than a full range of light work, with the following limitations:

> She can occasionally climb, balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to extreme cold and excessive vibration. She is limited to simple, repetitive, and routine tasks and can have only occasional interaction with the public.

(Tr. at 17, Finding No. 4.) At step four, the ALJ found that Claimant had no past relevant work. (Tr. at 20, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a product packager; laundry worker involving sorting, folding, and packaging; and office cleaner, at the

5

unskilled, light level of exertion and jobs such as machine monitor; product grader/sorter/selector; and clerical worker at the unskilled sedentary level of exertion. (Tr. at 20-21, Finding No. 9.) On this basis, benefits were denied. (Tr. at 21, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on, January 7, 1967, and was 45 years old at the time of the administrative hearing, September 11, 2012. (Tr. at 20, 32, 98 ) Claimant had at least a high school education and was able to communicate in English. (Tr. at 20, 32, 115, 117.) Claimant had no past relevant work. (Tr. at 20, 33, 39, 116.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to set out all of Claimant's limitations in his RFC assessment in a function-by-function assessment pursuant to SSR 96-8p. (Document No. 11 at 6-9.) Claimant cites her testimony, as well as Dr. Stauffer's decreased range of motion findings as support for her position. (<u>Id.</u> at 6-8.) She also notes that EMG and NCS reports indicated mild neuropathy and surgery was recommended. (<u>Id.</u> at 8.) Furthermore, x-rays revealed degenerative disc disease of her dorsal spine. (<u>Id.</u>) She asserts that the ALJ failed to explain which of the strength demands of light work that Claimant could not perform fully, only that she could perform less than a full range of light work. (<u>Id.</u> at 8-9.)

In Response, the Commissioner asserts that the ALJ captured all of Claimant's credibly established limitations in his RFC assessment. (Document No. 14 at 11-14.) The Commissioner cites to specific evidence in her brief that supports the ALJ's RFC assessment, including that her treatment was intermittent, routine, and conservative; she received no specialized mental health treatment and reported that medications helped her symptoms; she never pursed surgical referral for her CTS; although she lost medical insurance coverage, she never pursued other treatment options; Dr. Stauffer, Ms. Wilson, and Claimant's primary providers documented unremarkable examination findings; diagnostic studies generally were normal; Dr. Stauffer twice opined that she could perform light exertional level work; and despite her impairments, her activities supported the ALJ's RFC. (<u>Id.</u> at 12-13.) The Commissioner asserts that it would serve no purpose to remand this matter to require the ALJ to describe his RFC assessment with specificity. (Id. at 13.)

In Reply, Claimant asserts that the ALJ must specify which restrictions were less than the full range of light work, and thereby address her limitations on a function-by-function assessment.

(Document No. 15 at 1-2.)

Claimant next alleges that the ALJ's decision is not supported by substantial evidence because the ALJ failed to comply with 20 C.F.R. § 416.927 in assigning little weight to the report of Dr. Goudy, an examining psychologist. (Document No. 11 at 9-12.) Claimant asserts that Dr. Goudy provided the only psychological testing of record and that the ALJ erred in according his opinion little weight in part because Claimant was referred to him by her attorney. (Id. at 10-11.) Unlike Dr. Lilly, whose opinion the ALJ gave great weight, Claimant asserts that Dr. Goudy personally examined and observed Claimant and administered psychological testing. (Id. at 11.) Claimant notes that the ALJ referenced Ms. Wilson's examinations, but failed to evaluate or assign any weight to her opinion. (Id. at 12.) Consequently, the ALJ assigned more weight to a non-examining state agency consultant's opinion than he did to two psychological experts who both personally examined Claimant. (Id.)

In response, the Commissioner asserts that the ALJ properly evaluated the medical opinions of record. (Document No. 14 at 14-16.) The Commissioner asserts that Dr. Goudy was a one-time examiner at the request of Claimant's attorney, and therefore, his opinion never could have controlling weight. (Id. at 15.) The ALJ asserts that the ALJ accurately found that his extreme limitations were unsupported by the record, and therefore, the ALJ reasonably declined to adopt them. (Id.) The ALJ appropriately gave greater weight to the opinion of Dr. Lilly as her opinion was consistent with Claimant's treatment records and her activities. (Id.) Although Dr. Lilly did not examine Claimant, her opinion had value for purposes of evaluating Claimant's functional abilities. (Id. at 16.)

In reply, Claimant reiterates her arguments set forth in her brief. (Document No. 15 at 3-5.)

Finally, Claimant alleges that the ALJ's decision is not supported by substantial evidence

because the ALJ erred in finding that her CTS was not a severe impairment. (Document No. 11 at 12-14.) Claimant notes that Dr. Stauffer specifically stated that Claimant's main problem was going to be her CTS, and results of nerve conduction study tests revealed mild to moderate left neuropathy. (Id. at 13.) Claimant contends that the evidence of record, including two state agency consultative reports and a nerve conduction study, supports a finding that Claimant's CTS caused more than a slight abnormality in her ability to perform basic work activities. (Id. at 14.)

In response, the Commissioner asserts that the record did not support a finding that Claimant's CTS was a severe impairment. (Document No. 14 at 17-18.) The Commissioner asserts that a mere diagnosis by means of a nerve conduction study does not establish a severe impairment. (Id. at 17.) The Commissioner asserts that Claimant complained only once to her primary care provider about left wrist pain and during that visit she merely exhibited decreased left wrist range of motion due to pain and left hand x-rays were negative. (Id.) Furthermore, although Claimant requested a surgical referral for CTS, she failed to purse it and reported that injections and wrist braces alleviated her pain. (Id. at 17-18.) The Commissioner also notes that Dr. Stauffer reported full motor strength in her hands for grip strength and two state agency physicians found no manipulative limitations. (Id. at 18.) The Commissioner notes that the ALJ mistakenly stated in his decision that there was not a nerve conduction study. (Id.) Nevertheless, the mistake is immaterial because the diagnosis alone is insufficient and the evidence establishes that her CTS is not severe. (Id.) The Commissioner asserts that remand would not change the ALJ's step two determination. (Id.)

In reply, Claimant asserts that although a diagnosis alone is not sufficient to find a severe impairment, "it is certainly a starting point and one for which the ALJ seemed to be searching, but overlooked." (Document No. 15 at 5.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence of record, and will discuss it below as it relates to the undersigned's findings and recommendation.

Emily E. Wilson, M.A.:

Ms. Wilson, a licensed psychologist, conducted a mental status examination on April 6, 2010, at the request of the state agency. (Tr. at 205-09.) Claimant reported that she was applying for SSI due to depression and migraines. (Tr. at 205.) She reported daily depression with partial days of remission that began in her childhood and had worsened progressively the last two or three years. (Tr. at 206.) She indicated a lack of interest in things, an increased appetite with a 30-pound weight gain over a few years, difficulty sleeping, loss of energy, feelings of worthlessness, suicidal ideation, and increased irritability that began after she got married. (Id.) She treated at Prestera for two years and attended counseling when she had more energy. (Id.) Claimant reported her activities of daily living to have included maintaining her personal care independently, cleaning, cooking once a month, driving, shopping if she had to, handling her finances, doing dishes and straightening the house, and watching television. (Tr. at 207-08.)

On mental status exam, Ms. Wilson observed that Claimant had a slightly slumped posture and slow gait, was cooperative, interacted appropriately, maintained good eye contact, gave adequate and appropriate verbal responses, spoke coherently and relevantly, was oriented fully, had an appropriate mood and broad affect, and denied any hallucinations or delusions and suicidal or homicidal ideations. (Tr. at 208.) Claimant's recent and remote memory was within normal limits, her immediate memory was mildly deficient, her judgment was below average, concentration was moderately deficient, pace was mildly slow, and persistence and psychomotor behavior were within normal limits. (Id.) Ms. Wilson diagnosed major depressive disorder, moderate, single episode and

deferred a diagnosis at axis II based on her placement in special education classes when in school, her dropping out of school in the eighth grade, and her poor work history. (Tr. at 208-09.) Ms. Wilson opined that Claimant's prognosis was fair with consistent and appropriate psychotropic, medical, and psychological intervention and that she required assistance in managing her benefits. (Tr. at 209.)

Ms. Wilson conducted a second examination on March 29, 2011. (Tr. at 321-25.) This time Claimant stated that she was applying for benefits because "I don't want to be around nobody." (Tr. at 321.) Claimant reported several symptoms of anxiety with a several year history, including feelings of shakiness. (Tr. at 322.) She also continued to report symptoms of daily depression with a twenty-pound weight gain in the last year. (Id.) She indicated that she used to take Depakote, but was unable to afford the medication without insurance. (Tr. at 323.) Regarding her activities, Claimant reported in addition to the activities reported at her earlier exam, that she cleaned only every now and then due to motivational problems, was unable to handle her finances, and had difficulty sleeping due to pain. (Id.) Ms. Wilson noted that Claimant's mental status exam essentially was normal except her mood was flat and lacked expressiveness, judgment was below average, immediate memory was mildly deficient, concentration was moderately deficient, psychomotor activity was slowed, and pace was somewhat slowed. (Tr. at 323-24.) Ms. Wilson diagnosed mood disorder NOS. (Tr. at 324.) Ms. Wilson again deferred a diagnosis at axis II and noted that Claimant may have suffered from a learning or cognitive disorder based on her presentation and reported work and academic history. (Id.) She also noted that Claimant may have suffered from a personality disorder, which could be clarified from her treating therapist at Prestera. (Id.) Ms. Wilson again opined that Claimant's prognosis was poor, even with treatment, but that she was capable of managing her finances. (Id.)

<u>Timothy Saar, Ph.D. - Psychiatric Review Technique</u>:

On November 22, 2010, Dr. Saar completed a form Psychiatric Review Technique, on which he opined that Claimant's depression was not a severe impairment. (Tr. at 294-307.) Regarding the "B" criteria, Dr. Saar further opined that Claimant's mental impairment resulted in no restriction of activities of daily living; mild difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation each of extended duration. (Tr. at 304.)

<u>Debra Lilly, Ph.D. - Psychiatric Review Technique & Mental RFC Assessment</u>:

On May 7, 2011, Dr. Lilly completed a form Psychiatric Review Technique on which she opined that Claimant's mood disorder resulted in mild restriction of activities of daily living; mild difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation each of extended duration. (Tr. at 340-53.) She completed a second form Psychiatric Review Technique, also dated on May 7, 2011, on which she opined that Claimant's mood disorder resulted in mild restriction of activities of daily living; moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation each of extended duration. (Tr. at 354-67.) Dr. Lilly completed a form Mental RFC Assessment on which she opined that Claimant was limited moderately in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and ability to interact appropriate with the general public. (Tr. at 368-70.) She opined that Claimant was capable "to learn, recall, and perform routine, repetitive tasks that do not require frequent interactions with the general public." (Tr. at 370.)

<u>Tony Goudy, Ph.D. - Psychological Evaluation</u>:

On August 29, 2012, Dr. Goudy, a licensed psychologist, conducted a psychological evaluation, at the request of Claimant's attorney. (Tr. at 384-89.) Claimant reported academic

difficulties during her schooling, and depression with symptoms consistent with anhedonia. (Tr. at 384.) She indicated that she had lost interest in everything and laid around the house, had a poor appetite with a recent fifteen pound weight loss, suffered from chronic sleep difficulties, always was tired, experienced feelings of guilt and worthlessness, had difficulty concentrating and controlling her emotions, experienced several crying spells per week, and reported some suicidal ideations four or five years ago. (Tr. at 384-85.) She was not taking any medication to help with her depression. (Tr. at 385.) She reported that when in school, she was retained in the third grade and graduated from high school. (Tr. at 386.) She subsequently attempted to study computers at a junior college but gave up after having to repeat most all of her classes. (Id.)

On mental status exam, Dr. Goudy noted that Claimant was cooperative but reserved and made little eye contact, was tired with a blunted affect, spoke coherently but failed to generate spontaneous conversation, denied recent suicidal ideation, was well-oriented, had intact judgment, was of limited intellect and in the high borderline to low average range intellectually, was markedly impaired in concentration, had intact immediate memory but moderate to marked impairment in recent memory and moderately impaired remote memory. (Tr. at 386-87.) Results of the BDI-II indicated severe levels of depression. (Tr. at 387.) Claimant's Full Scale IQ was 82, which placed her in the upper end of the borderline range of intellectual functioning. (Id.) Dr. Goudy diagnosed depressive disorder NOS and borderline intellectual functioning, and assessed a GAF of 55.[2] (Tr. at 388.) He opined that she suffered from mild limitations in activities of daily living; moderate limitations in social functioning; marked limitations in maintaining concentration, persistence, or

---

[2] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994)

pace; and no episodes of decompensation of extended duration. (Tr. at 389.) Thus, he opined that Claimant did not meet a listing level impairment based solely on psychological factors. (Id.)

Dr. Goudy also completed a form Mental Assessment of Ability to Do Work-Related Activities, on which he opined that Claimant was markedly impaired in her ability to deal with work stresses; maintain attention and concentration; understand, remember, and carry out complex job instructions. (Tr. at 390-92.) He opined that she was moderately impaired in her ability to relate to co-workers; deal with the public; interact with supervisors; function independently; understand, remember, and carry out detailed but not complex job instructions; understand, remember, and carry out simple job instructions; behave in an emotionally stable manner; relate predictably in social situations; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id.) Finally, Dr. Goudy indicated that Claimant only was slightly impaired in her ability to maintain personal appearance, follow work rules, and use judgment. (Id.) In support of his opinions, he referenced the report of his psychological evaluation. (Id.)

Roy W. Stauffer, M.D. - Consultative Examination:

A CT Scan on June 8, 2011, revealed a 2.5cm left ovarian cyst. (Tr. at 383.)

On April 14, 2010, Dr. Stauffer, at the request of the state agency, conducted a consultative exam for complaints of back pain, CTS, migraine headaches, and multiple mental allegations. (Tr. at 210-15.) Claimant reported back pain for years without any specific diagnosis by a physician, though she had seen a chiropractor. (Tr. at 210.) She described the pain as constant with radiation to her hips and shoulders, that was worse when standing more than five minutes and with lifting or pulling. (Id.) She reported CTS, left worse than right, characterized by pain and numbness in her hands that was worse in cold weather and at night. (Id.) She wore a brace at night, which helped, and

14

had a positive nerve conduction velocity study on the left. (Tr. at 210-11.) She reported difficulty gripping, dropping objects, and tightening. (Tr. at 211.) Claimant reported daily migraine headaches that ranged from a dull ache to a throbbing sensation, associated with nausea and light sensitivity. (Id.) She took Depakote and Propranolol, with some relief, and Imitrex. (Id.)

Physical exam demonstrated that Claimant was severely obese at 214 pounds, wore bilateral wrist splints, and that she walked into the office with a normal gait and station, without assistive device. (Tr. at 211-12.) She had tenderness over the lumbar spine with bilateral straight leg raise at 90 degrees with low back pain. (Tr. at 212.) She exhibited decreased lumbar spine flexion to 70 degrees, but no other limitations. (Id.) Motor strength was 5/5 bilaterally in the upper and lower extremities and grip strength, she had normal sensation, she was able to knee squat and walk on her heels and toes with hip pain, reflexes were symmetrical, and she had positive Tinel's sign in both wrists. (Id.) Dr. Stauffer diagnosed chronic back pain probably secondary to strain without evidence of radiculopathy, history of bilateral CTS, migraine headaches, hypertension controlled, and obesity. (Id.) He opined that Claimant could lift 20 pounds occasionally and frequently, but could not lift repetitively ten pounds. (Id.) He further opined that she could stand, walk, and sit six hours in and eight-hour days; occasionally push or pull but must avoid repetitive use of her upper extremities; occasionally balance, stoop, kneel, crouch, and crawl but must avoid ladders, ropes, and scaffolds due to her obesity and back pain; and must avoid repetitive use of her hands. (Id.)

On April 20, 2011, Dr. Stauffer conducted another exam, at which time Claimant again reported migraine headaches, CTS, low back pain, arthritis, and an artificial larynx. (Tr. at 326-31.) The migraines lasted six to ten hours, were of a throbbing nature, and she experienced light and noise sensitivity with the headaches. (Tr. at 326.) Over-the-counter medications did not help. (Id.) She used splints on her wrists at night, which helped her CTS, though her hands continued to ache

15

and she had difficulty gripping and often dropped objects. (Id.) She reported constant back pain with radiation down to her left hip. (Tr. at 327.) Chiropractic treatment did not help and over-the-counter medications helped occasionally. (Id.) She reported difficulty lifting, pulling, and standing longer than 15 minutes, and indicated that she had to lean on the buggy inside stores. (Id.)

On examination, Dr. Stauffer noted tenderness over the lumbar spine, straight leg raising bilaterally at 90 degrees with left hip pain, ambulation without a cane, a mild decrease in left hip range of motion and lumbar spine flexion secondary to pain. (Tr. at 328.) She had a minimally antalgic gait, full motor strength for grip in both hands and all extremities, was able to perform fine manipulation and gross dexterous movements with her hands, had intact sensation, was able to squat half way down with left leg and hip pain, was able to walk on her heels and toes with left hip pain, and had a positive Tinel's sign in both wrists. (Id.) Mental status exam revealed that Claimant was very emotional throughout the exam and tended to cry. (Id.)

Dr. Stauffer assessed history of migraine headaches, bilateral CTS, chronic low back pain without evidence of radiculopathy, history of degenerative disc disease and degenerative joint disease, history of congenital absence of larynx, artificial larynx implant, history of hypertension controlled, and obesity. (Id.) He opined that from a working standpoint, Claimant's main problems were her CTS and back and hip pain. (Tr. at 328-29.) He opined that Claimant was capable of lifting twenty pounds occasionally and ten pounds frequently; could stand, sit, and walk six hours in and eight-hour workday; could push and pull without difficulty; could occasionally climb ladder, rope, and scaffold; could occasionally balance, stoop, kneel, crouch, and crawl; should never perform any repetitive work with her hands; and should avoid any commercial driving due to her CTS. (Tr. at 329.)

James Egnor, M.D. - Physical RFC Assessment:

On November 23, 2010, Dr. Egnor completed a form Physical RFC Assessment, on which he opined that Claimant was capable of performing light exertional level work with occasional postural limitations and an avoidance of concentrated exposure to extreme cold and vibration, due to her chronic pains. (Tr. at 308-15.) Dr. Egnor agreed with Dr. Stauffer's opinion with the additional environmental limitations due to chronic pain and the absence of hand restrictions because Claimant's grip and motor abilities were normal during his exam. (Tr. at 314.) Dr. Egnor also noted that he agreed with Dr. Stauffer's assessment of light exertional level work, but noted that additional limitations due to Claimant's obesity were not warranted because her obesity was not in the morbid range. (Id.)

Subjash Gajendragadkar, M.D. - Physical RFC Assessment:

Dr. Gajendragadkar also completed a form Physical RFC Assessment on May 6, 2011, on which he likewise opined that Claimant was capable of performing light exertional level work with occasional postural limitations and an avoidance of extreme cold, vibrations, and hazards. (Tr. at 332-39.) Dr. Gajendragadkar also opined that Claimant had moderate limitations for repetitive movements of her hands and wrists bilaterally due to CTS. (Tr. at 333.)

Analysis.

1. RFC Assessment.

Claimant first alleges that the ALJ erred  in assessing his RFC because he failed to set out all of Claimant's limitations in a function-by-function assessment pursuant to SSR 96-8p. (Document No. 11 at 6-9.) . "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case

record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2012). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

In his decision, the ALJ concluded that Claimant was limited to less than a full range of light work with occasional postural limitations and environmental limitations for extreme cold and vibration, as well as nonexertional limitations of simple, repetitive, and routine tasks with only occasional interaction with the public. (Tr. at 17.) In reaching this decision, the ALJ relied upon Claimant's testimony, the medical evidence, and the opinion evidence of record. (Tr. at 17-20.) The ALJ acknowledged that Claimant received conservative treatment modalities, such as chiropractic treatment and over-the-counter medications. (Tr. at 19.)The record consisted of few office visit records. The ALJ summarized Claimant's reported activities, which he noted supported his RFC assessment. (Id.) The ALJ acknowledged Dr. Stauffer's consultative examination report, which indicated normal ranges of motion, strength, and grip, and found that it was consistent with the state agency consultants' opinions. (Tr. at 19-20.) As discussed below, the ALJ also considered the opinions of Ms. Wilson, Dr. Goudy, and Dr. Lilly regarding Claimant's mental impairments. (Id.) The undersigned finds that the ALJ adequately assessed Claimant's RFC.

Claimant contends, however, that the ALJ should have provided a function-by-function assessment rather than stating that she was limited to less than a full range of light exertional level work. Claimant cites Young v. Astrue, 771 F.Supp.2d 610 (S.D.W.Va. 2011), in support of her argument. (Document No. 15 at 2-3.)  In Young, this District Court held that "the ALJ's failure to incorporate the additional functional limitations or restrictions in Claimant's RFC assessment constituted a significant omission that irreparably skewed the decision-making process." Id. at 621. The Court noted that the failure to include a function-by-function assessment could result in the ALJ "overlooking some of an individual's limitations or restrictions," which "could lead to an incorrect use of an exertional category." Id. at 620. In Young, however, the ALJ stated the exertional category and went to identify the following nonexertional limitations, but failed to do so. In the instant case, the ALJ identified the exertional category as less than a full range of light exertion and set forth specific nonexertional limitations. Thus, although the ALJ should always specifically define the exertional category, the undersigned finds the distinguishing feature from the Young case to be the identification of nonexertional limitations. The ALJ has identified the exertional category, less than full range of light, which is more than sedentary, plus the specifically delineated nonexertional limitations, which are supported by the evidence of record. Accordingly, the undersigned finds that any error the ALJ may have committed, is harmless in this instance.

2. Opinion Evidence.

Claimant next alleges that the ALJ erred in assessing the opinion of examining psychologist, Dr. Goudy. (Document No. 11 at 9-12.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2012). These factors include: (1) length of the treatment relationship and frequency of evaluation,

(2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2012). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In his decision, the ALJ acknowledged the opinions of Ms. Wilson, Dr. Lilly, and Dr. Goudy. (Tr. at 19-20.) As Claimant notes, the ALJ summarized the evaluations by Ms. Wilson but did not

assign any weight to her opinions. (Tr. at 19.) The ALJ gave great weight to Dr. Lilly's opinion that Claimant was able to learn, recall, and perform routine, repetitive tasks that did not require frequent interactions with the general public. (Id.) The ALJ found that Dr. Lilly's opinion was considerate of Claimant's subjective complaints and consistent with her limited mental health history. (Id.) The ALJ noted Claimant's testimony of some social isolation but that she also socialized with friends and family. (Id.) The ALJ however, gave little weight to Dr. Goudy's opinion because the degrees of his limitations were not supported by the objective evidence. (Tr. at 20.) Dr. Goudy assessed marked limitations in dealing with work stress, maintaining attention and concentration, and carrying out complex job instructions. (Id.) The ALJ noted Claimant's testimony and reported activities wherein she spent the day watching television, managed her own finances, used the computer, and read. (Id.) Moreover, Claimant had indicated that she could follow instructions and Ms. Wilson assessed only moderate deficiencies in concentration and normal persistence. (Id.) The ALJ therefore, gave specific reasons why he discredited Dr. Goudy's limitations and it did not matter that he conducted psychological testing or that Dr. Lilly was only a reviewing physician. The ALJ's analysis is set forth in his decision and is supported by the record. Accordingly, the undersigned finds that the ALJ's decision is supported by substantial evidence of record.

3. CTS - Severe Impairment.

Finally, Claimant alleges that the ALJ erred in failing to find that her CTS was a severe impairment. (Document No. 11 at 12-14.) To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2012). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical

21

functions such as sitting and standing; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. Id.; §§ 404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original); see also SSR 85-28 (An impairment is considered not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered."); SSR 96-3p (An impairment "is considered 'not severe' if it is a slight abnormality(ies) that causes no more than minimal limitation in the individual's ability to function independently, appropriately, and effectively in an age-appropriate manner."). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As discussed above, the determination whether a claimant has a severe impairment is made at the second step of the sequential analysis.

In his decision, the ALJ noted that although Dr. Stauffer noted a positive Tinel's sign, Claimant exhibited normal muscle and grip strength in the upper extremities, had intact fine manipulation, and had intact gross dexterous movements. (Tr. at 13.) The ALJ mistakenly noted that the evidence failed to demonstrate nerve conduction testing to confirm a diagnosis. (Id.) Nevertheless, the undersigned finds the ALJ's misstatement harmless as the evidence establishes

that her CTS did not constitute a severe impairment and the mere diagnosis does not establish severity. Dr. Stauffer noted on two occasions that Claimant had full motor strength in both hands for grip and could perform fine manipulation. (Tr. at 212, 328.) Furthermore, although Claimant requested a surgical referral for her CTS, she failed to pursue it. Finally, neither Dr. Egnor nor Dr. Gajendragadkar assessed any manipulative limitations in their RFC assessments. (Tr. at 308-15, 332-39.) The record fails to establish any limitations resulting from Claimant's CTS. Accordingly, the undersigned finds that the ALJ's decision that Claimant's CTS is non-severe is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 14.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo*

review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).  Copies of such objections shall be served on opposing parties, Chief Judge Chambers, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

DATE: February 27, 2015.

R. Clarke VanDervort
United States Magistrate Judge